UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD DEAN GOOLSBY,<br><br>        Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>        Defendant. | Case No.: 1:15-cv-00615 - JLT<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF CLIFFORD DEAN GOOLSBY AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Clifford Dean Goolsby asserts he is entitled to a period of disability, disability insurance benefits, and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating the medical record and seeks judicial review of the decision to deny his application for benefits.  Because the ALJ failed to apply the proper legal standards, as discussed below, the administrative decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

**PROCEDURAL HISTORY**

In his applications for benefits, Plaintiff asserted that he became disabled as of June 9, 2012, due to an aneurism, speech difficulties, depression, bad memory, and low mobility in his right arm.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

(Doc. 14-6 at 2, 8)  The Social Security Administration denied Plaintiff's applications at both the initial level and upon reconsideration.  (*See generally* Doc. 14-4; Doc. 14-3 at 9)  After requesting a hearing, Plaintiff testified before an ALJ on October 16, 2014.  (Doc. 14-3 at 9, 27)  The ALJ determined Plaintiff was not disabled and issued an order denying benefits on November 25, 2014.  (*Id.* at 9-20)  When the Appeals Council denied Plaintiff's request for review of the decision (*id.* at 2-3), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence.  *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## ADMINISTRATIVE DETERMINATION

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

**A.   Relevant Medical Evidence**[2]

Plaintiff's records from the Veteran's Administration indicate that he had a history of "[a]lcohol dependence, dysphoric mood, suicidal ideations and intent." (Doc. 14-11 at 92) In addition, he was diagnosed with a depressive disorder. (*Id.* at 93) In November 2007, Plaintiff was hospitalized "with a long history of depression and multiple suicide attempts," and remained hospitalized for four days. (Doc. 14-12 at 65)

On June 8, 2012, paramedics transported Plaintiff for emergency care after he "called the ambulance for a headache." (Doc. 14-10 at 101) The paramedics reported "they witnessed [Plaintiff] seizing with [altered mental status] upon arrival." (*Id.* at 104; *see also* Doc. 14-10 at 106) Plaintiff had a low level of consciousness, and his motor responses were "only to painful stimuli." (*Id.* at 104) Further, he was unable to speak, and only opened his eyes "with painful stimuli." (*Id.*) Plaintiff had a CT scan on his head, which showed "subarachnoid blood dominantly within the basal cisterns, suggesting a possible underlying aneurysm." (*Id.* at 10) Dr. Heidi Dambach determined this was a

---

[2] Plaintiff does not challenge the ALJ's findings related to his physical abilities. Accordingly, while the Court has reviewed the entirety of the record, the focus of the summary of record is the medical evidence related to Plaintiff's alleged mental impairments, limitations, and abilities.

"critical abnormality," and Plaintiff was transferred to the San Francisco VA facility for surgery. (*Id.*; Doc. 14-8 at 24) On June 12, Plaintiff had a right frontal craniotomy and "clipping" of the ruptured carotid artery. (Doc. 14-8 at 24)

Following the surgery, Plaintiff was transferred back to the Fresno VA hospital for "acute rehab" beginning July 17, 2012. (Doc. 14-8 at 92) Plaintiff began physical therapy "for increasing mobilization." (*Id.* at 25) During the physical therapy consultation, Plaintiff was able to follow a two-step command, and no barriers to learning were identified. (*Id.* at 42) On July 27, Plaintiff was discharged to a skilled nursing facility for a thirty-day stay, with the following diagnoses: "[h]istory of subarachnoid hemorrhage, status post right internal carotid artery clipping;" "left femoral deep venous thrombosis;" gout; hypertension; hyperlipidemia; and depression. (*Id.* at 24-25, 30) At the nursing facility, Plaintiff received "occupational therapy" for four weeks. (*Id.* at 31) He was discharged on August 29, 2012. (*Id.*)

Plaintiff met with Timothy Jones, a social worker for homeless veterans, on September 6, 2012. (Doc. 14-8 at 69) Plaintiff reported he was able to "adequately" perform his activities of daily living, though he continued to have "some health issues." (*Id.*) Plaintiff expressed "interest[] in going back to school… [and] looking for employment." (*Id.*) In responding to the intake questions, Plaintiff indicated he did not have mental health concerns. (*Id.* at 73) However, Plaintiff also reported he had PTSD, anxiety, and depression. (*Id.* at 79-80)

Dr. Christina Hernandez examined Plaintiff as part of a "routine visit" following his discharge from the nursing facility on September 7, 2012. (Doc. 14-8 at 65) Plaintiff reported he "usually [had] headaches, 4/10 in intensity, on the right temporal area," for which he was told to take Tylenol. (*Id.*) In addition, Plaintiff described depression but had no suicidal or homicidal ideation. (*Id.*) According to Dr. Hernandez, Plaintiff did not have any confusion and had an "[a]ppropriate affect." (*Id.* at 66)

In November 2012, Plaintiff was "referred to Speech Therapy for 'memory deficits'" after a social worker noticed a recommendation had been made in July 2012 but failed to be placed by a medical provider. (Doc. 14-11 at 79, 80) After the social worker made the request, Plaintiff met with Dr. Dorythea Williams to begin therapy on December 6, 2012. (*Id.* at 38) Dr. Williams observed that Plaintiff had "[m]ild speech assimilations and "slight hyponasal resonance" but used "intact linguistic

syntax, grammer (sic) and references." (*Id.*)  Plaintiff told Dr. Williams that he was having difficulty handling four college courses at that time. (*Id.* at 39)  Dr. Williams noted Plaintiff "admitted having only mild memory" difficulties. (*Id.* at 39)

Dr. Fariba Vesali performed a comprehensive neurological evaluation on December 14, 2012. (Doc. 14-11 at 16)  Plaintiff reported that he had "difficulties to concentrate and [got] drowsy all the time." (*Id.*)  Plaintiff told Dr. Vesali that he was living "in a housing facility through Veterans Administration Hospital," where Plaintiff did chores such as dishes, laundry, and vacuuming. (*Id.*)  According to Dr. Vesali, Plaintiff "did not have any difficulties to hear questions and answer appropriately," and "was oriented to times, place, and person." (*Id.* at 17)  Dr. Vesali opined Plaintiff "should be able to walk and stand six hours in an eight-hour day with breaks every one hour for stretching," "sit with no limitations," and "lift/carry 50 pounds occasionally and 25 pounds frequently." (*Id.* at 18-19)  Dr. Vesali did not offer any functional assessment conclusions related to Plaintiff's mental abilities. (*See id.*)

On January 7, 2013, Dr. Williams noted that Plaintiff was thirty minutes late for his appointment. (Doc. 14-11 at 59)  She administered the Ross Information Processing Assessment ("RIPA"), and found Plaintiff's "lowest score was for organization." (*Id.* at 60)  In addition, Plaintiff demonstrated "moderate losses" for problem solving, immediate memory and remote memory;" and "mild losses" for "recent memory, spatial orientation, orientation to environment and general information." (*Id.* at 60)  Dr. Williams noted that Plaintiff's "highest scores were for auditory processing and retention and for temporal orientation." (*Id.*)  She opined that Plaintiff's organization would "need to be addressed," as well as his memory and problem-solving. (*Id.*)

Plaintiff had an appointment with Dr. Williams on February 14, 2013 but confused the dates and reported for the appointment a day earlier than scheduled. (Doc. 14-11 at 57)  Dr. Williams noted that Plaintiff "followed verbal 1, 2, and 3 stage commands [with] 90% accuracy." (*Id.*)  At a follow-up appointment on February 27, Plaintiff reported he was "concerned about his grades in City College." (*Id.* at 49)  Dr. Williams opined that Plaintiff's "auditory processing/immediate memory activity rendered 98% accuracy on initial trial." (*Id.*)  In addition, Dr. Williams evaluated Plaintiff's reading comprehension and found "unremarkable initial response." (*Id.*)  Dr. Williams opined that Plaintiff's

"errors in processing appeared to correspond to the level of material complexity." (*Id.*) She observed Plaintiff had difficulty with "recall[ing] the names of items in specific categories," such as identifying states in this country. (*Id.*)

Dr. Anna Franco reviewed the record in June 2013, and noted that Plaintiff was taking four college classes in December, and "admitted to having only mild [memory]" difficulties. (Doc. 14-4 at 26) In addition, she noted Plaintiff was able "to follow single 2 stage and some 3 stage commands," with 98% accuracy on auditory processing. (*Id.*) She observed that Plaintiff was independent with his activities of daily living, and opined the cognitive difficulties appeared "mild and overall stable and overall non severe." (*Id.*) Further, Dr. Franco concluded that Plaintiff's depression was stable. (*Id.*) Accordingly, Dr. Franco concluded Plaintiff did not have a severe mental impairment. (*Id.*)

On August 22, 2013, Dr. Elbert Tun and Trina Brugetti, a licensed vocational nurse, both gave Plaintiff a "depression screenings." (Doc. 14-13 at 6-8) Ms. Brughetti noted that Plaintiff reported he had little interest or pleasure in doing things "[n]early every day;" and he also felt down, depressed, or hopeless "[n]early every day." (*Id.* at 6) Ms. Brugetti concluded Plaintiff's score on the PHQ-2 depression screening was a "6," indicating "a positive screen for depression." (*Id.*) After Plaintiff's positive results, Dr. Tun administered a PHQ-9 screening to evaluate the extent of the depression. (*Id.* at 6) Plaintiff reported he did not have difficulty with sleep; poor appetite; suicidal thoughts; or trouble concentrating on things, such as reading a newspaper or watching television. (*Id.* at 6-7) Dr. Tun determined Plaintiff's score on the PHQ-9 was a "3," which was "suggestive of no depression." (*Id.* at 7) Based upon the evaluation, Dr. Tun determined Plaintiff's depression could be managed with primary care, and Plaintiff was to continue taking paroxetine 40mg daily. (*Id.* at 6-7)

In January 2014, Plaintiff had an initial intake evaluation with the mental health department, reporting he had stopped medication and became depressed. (Doc. 14-12 at 64) Plaintiff reported he had difficulty sleeping and did "not feel rested in the [morning] upon awaking." (*Id.*) He denied getting irritable and angry, but endorsed "feeling hopeless, helpless and worthless… because of the way things [were] in his life." (*Id.*) Plaintiff said there were times "he crie[d] at home due to depression" and that he did not do anything for fun or activity. (*Id.*) He stated he did not have impairments with carrying for himself, such as grooming or food preparation. (*Id.* at 68) Roger Emes, NP-C, observed

6

that Plaintiff's mood was constricted, but his thought content was appropriate. (*Id.* at 68-69) He found Plaintiff's attention and concentration was satisfactory, but Plaintiff's memory was impaired because he remembered only two of three comments and "0/1 with cue." (*Id.* at 69) Plaintiff was given a GAF score of 55[3], and diagnosed with "major depressive affective disorder, recurrent episode, moderate degree." (*Id* at 71; Doc. 14-11 at 85)

**B.    Lay Witness Testimony**

Maryam M. Suluki, a member of Plaintiff's extended family, wrote a letter to Ms. Proudin in September 2014 "to give… feedback on [her] daily interactions" with Plaintiff. (Doc. 14-7 at 67-68) Ms. Suluki reported that she observed Plaintiff's "forgetfulness on many occasions." (*Id.* at 67) For example, Ms. Suluki explained she knew Plaintiff "was well trained in computers," so she asked him for assistance with a problem. (*Id.*) Ms. Suluki reported she had to "describ[e] the problem several times" and "finally described something very simple." (*Id.*) Plaintiff told her that the problem was fixed, but Ms. Suluki later discovered the problem was still present. (*Id.*) She reports that on another occasion she had Plaintiff load a program, "[b]ut an hour later when asked to explain… how to do it, he was unable to remember what he had done." (*Id.*)

Ms. Suluki stated Plaintiff isolated himself, and had "been unable to remember appointments, whether he has talked to a [doctor], an agency, or take care of financial responsibilities." (Doc. 14-7 at 67) According to Ms. Suluki, she "originally assumed the forgetfulness was related to the aneurysm," but she "truly believe[d]" that Plaintiff had "severe depression which affects his ability to reason, problem solve or think logically." (*Id.*) Ms. Suluki reported that Plaintiff "had several job opportunities because he presents well," but she "suspect[ed] …intense interviewing reveals there is some difficulty with his executive functioning ability." (*Id.* at 68)

**C.    Administrative Hearing Testimony**

Plaintiff appeared for a hearing before the ALJ on October 16, 2014. (Doc. 14-3 at 27) At the hearing, Plaintiff's counsel, Melissa Proudian, asserted in her opening statement that Plaintiff "suffered

---

[3] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV"). A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflict with peers or co-workers)." *Id.*

cognitive difficulties" following his aneurism in July 2012. (*Id.* at 29) For example, she reported Plaintiff's "immediate and remote memory were affected [and] his problem solving skills were affected." (*Id.*) Ms. Proudian said Plaintiff did "not have the ability to concentrate for two hour increments and stay on task." (*Id.* at 30)

Plaintiff testified that he had a college degree in Electrical Engineering and Computer Science from UC Berkley and last worked in 2012. (Doc. 14-3 at 34, 44) He said his vocational history included working as a telecommunications specialist for the Air Force, website maintenance, film development, police dispatch, parking attendant and software analyst. (*Id.* at 35-41) Plaintiff reported that he had actively been looking for work after 2012, but had "a hard time finding" software positions to apply for in Fresno, California. (*Id.* at 44)

He reported that he was taking medication for depression, and the prescription had "recently changed." (Doc. 14-3 at 46) Plaintiff said he found it was "hard to do anything," and he "spent several days just unable to get up." (*Id.*) He testified he felt "extremely bad about everything," and it was "hard for [him] to concentrate on doing things." (*Id.*) For example, Plaintiff said he had been "in a training program for H&R Block to prepare taxes," but "found that the amount of work was simply too much," because he could not concentrate to do the reading assignments of 30-50 pages per day. (*Id.* at 47-48) Plaintiff testified he could read a page and not remember what he read, and he needed to take a break "[e]very half hour or so." (*Id.* at 48) As a result, Plaintiff gave up the program after about six weeks. (*Id.*)

Plaintiff described his mood as "[e]xtremely depressed, and said he felt like he lacked motivation. (Doc. 14-3 at 62-63) He explained he felt like he "should be getting up and doing something, but…[was] just not able to." (*Id.* at 63) Plaintiff reported he had suicidal thoughts, including the day of the hearing, but he did not want to talk about it because he previously had been hospitalized at a VA Hospital and did not "want to go back to that." (*Id.* at 63-64)

**D.    The ALJ's Findings**

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of June 9, 2012. (Doc. 14-3 at 11) At step two, the ALJ found Plaintiff's severe impairments included: "a history of a cerebral aneurysm with stenting with

8

very mild right lower extremity spastic paresis, osteoarthritis, gout, and a major depressive disorder."
(*Id.*)  At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing.  (*Id.* at 11-12)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and walk 6 hours in an 8-hour workday, sit 6 hours in an 8-hour workday, and frequently stoop, kneel, crouch, and crawl.  He must avoid concentrated [exposure] to fast moving machinery, unprotected heights, and uneven terrain.  He must take a one-minute break each hour to stretch.  He can perform simple routine tasks (20 CFR 404.1567(c) and 416.967(c)).

(*Id.* at 13)  With this residual functional capacity, the ALJ concluded Plaintiff was "capable of performing past relevant work as an assembler and parking lot attendant" as well as "other jobs that exist in significant numbers in the national economy."  (*Id.* at 18)  Therefore, the ALJ found Plaintiff was not disabled as defined by the Social Security Act.  (*Id.* at 19-20)

## DISCUSSION AND ANALYSIS

### A.     Lay Witness Statement

Plaintiff asserts the ALJ erred in rejecting the lay witness statement of Ms. Suluki related to his mental impairments.  (Doc. 19 at 10-12)  The ALJ must consider statements of "non-medical sources" including spouses, parents, and other relatives in determining the severity of a claimant's symptoms. 20 C.F.R. § 404.1513(d)(4); *see also Stout v. Comm'r of Soc. Sec.*, 454 F.3d 1050, 1053 (9th Cir. 2006) ("determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to do work").  As a general rule, "lay witness testimony as to a claimant's symptoms or how an impairment affects ability to work is competent evidence, and therefore cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (emphasis and internal citations omitted).

To discount the testimony of a lay witness, the ALJ must give specific, germane reasons for rejecting the opinion of the witness. *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 1993).  Here, in assessing the statement of Ms. Suluki, the ALJ indicated:

> The undersigned gives only some weight to Ms. Sulukis statements, due to their inconsistency with the objective medical evidence and medical opinions of record.  Furthermore, there was insufficient evidence she had the medical training to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms.  More importantly, by virtue of her familial relationship with the claimant, she is not a

> disinterested third party witness whose statements would not tend to be colored by affection for the claimant and a natural tendency to agree with the symptoms and limitations the claimant alleges.

(Doc. 14-3 at 17) Plaintiff contends these are not proper reasons for rejecting the lay witness statement of Ms. Suluki. (Doc. 19 at 11-12) On the other hand, the Commissioner asserts the ALJ properly identified germane reasons to give only some weight to the opinion. (Doc. 21 at 31-32)

### 1. Familial relationship

As an initial matter, the Ninth Circuit determined that rejecting lay witness testimony on the grounds that the witness is related to the claimant, such as a spouse, and not a disinterested in party in the action, is not a ground for rejecting the testimony. *See Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 694 (9th Cir. 2009). The Court explained:

> Such a broad rationale for rejection contradicts our insistence that, regardless of whether they are interested parties, "friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to [his or] her condition." *Dodrill*, 12 F.3d at 918-919.

*Id.* The ALJ did not find Ms. Suluki had little opportunity to observe Plaintiff, or that she exaggerated Plaintiff's symptoms for him to obtain disability benefits. The fact that she is related to Plaintiff alone fails to support the ALJ's decision to give her statement less weight. *See Valentine*, 574. F3d at 694; *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) ("[t]he fact that a lay witness is a family member cannot be a ground for rejecting his or her testimony"). Accordingly, this factor does not support the decision to give less weight to the opinion of Ms. Suluki.

### 2. Lack of medical training

The ALJ purports to discredit the statement of Ms. Suluki simply because she does not have any medical training "to make exacting observations as to dates, frequencies, types, and degrees of medical signs and symptoms or the frequency or intensity of unusual moods or mannerisms." (Doc. 14-3 at 17) However, a review of the lay witness statement reveals that Ms. Suluki does not attempt to make "exacting observations" regarding Plaintiff's mental impairments. Instead, Ms. Suluki offers personal observations of Plaintiff's struggle with his memory, including specific examples of her interactions with Plaintiff.

Moreover, the Regulations specifically instruct all administrative law judges to consider

testimony from "non-medical sources" who have an opportunity to observe the claimant. *See* 20 C.F.R. §§ 404.1513(d)(4), 416.913(d)(4). Consequently the fact that Ms. Suluki did not have medical training is not a proper reason to reject her statement. *See Dodrill*, 12 F.3d at 919 (explaining the Regulations instruct the ALJ to "consider observations b*y non-medical sources* as to how an impairment affects a claimant's ability to work" [emphasis added]).

### 3. Inconsistency with the medical record

Defendant observes that the Ninth Circuit has determined inconsistency "with the medical evidence of record… is a germane reason to discount lay witness testimony." (Doc. 21 at 31, citing *e.g., Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006)). On the other hand, the Ninth Circuit has also determined that an ALJ may not simply "discredit [the] lay testimony as not supported by medical evidence in the record." *Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2008) (citing *Smolen*, 80 F.3d at 1289)

Significantly, in cases cited by Defendant, the ALJ identified specific inconsistencies between the lay witnesses' statements and the medical record. For example, in *Gregor*, the ALJ found the lay witness' testimony was inconsistent with the claimant's "failure to participate in cardiac rehabilitation" and his "presentation to treating physicians during the period at issue." *Id.*, 464 F.3d at 972. Likewise, in *Lewis*, the ALJ found the lay witness' statements were contrary to "documented medical history and findings," including records showing that the claimant's "disorder was relatively well controlled when he complied with medications, and … he had no significant adverse side effects." *Id.*, 236 F.3d at 511. In contrast, here, the ALJ did not identify any specific inconsistencies, and only offered her conclusion that the statements were "inconsisten[t] with the objective medical evidence and medical opinions of record." (Doc. 14-3 at 17)

Moreover, this case is distinguishable from *Bayliss*, in which the plaintiff argued the ALJ improperly rejected portions of lay witnesses' testimony because the ALJ accepted testimony of the claimant's family and friends "that was consistent with the record of [her] activities and the objective evidence in the record; he rejected portions of their testimony that did not meet this standard." *Bayliss*, 427 F.3d at 1211. The Court found inconsistency with the record was a germane reason to reject the

lay witness testimony, because "rejection of certain testimony was supported by substantial evidence." *Id.* While the ALJ indicates here that she gave "only some weight" to the opinion, the ALJ does not identify which portions of the statement that are rejected or adopted. Without such information, the Court is unable to find substantial evidence supports the rejection of Ms. Suluki's statements.

**B.     The Residual Functional Capacity**

Plaintiff's contends that the ALJ erred in determining his mental residual functional capacity. (Doc. 19 at 9-10) A claimant's residual functional capacity ("RFC") is "the most [a claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also* 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00(c) (defining an RFC as the "maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs"). In formulating a RFC, the ALJ weighs medical and other source opinions, as well as the claimant's credibility. *See, e.g., Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226 (9th Cir. 2009). Further, the ALJ must consider "all of [a claimant's] medically determinable impairments"—whether severe or not—when assessing a RFC. 20 C.F.R. §§ 405.1545(a)(2), 416.945(a)(2).

Significantly, the record here does not include any opinion supporting the limitation to "simple routine tasks" that the ALJ included in the RFC. The Regulations indicate medical opinions are statements that "reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis, and prognosis, what you can do despite your impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The ALJ had only an opinion from Dr. Franco that Plaintiff's mental impairments were not severe, which the ALJ rejected in light of "records showing the claimant was on medication for depression and had some memory deficits." (Doc. 14-3 at 17)

Because the record did not include any opinions from treating or examining physicians related to Plaintiff's mental abilities, the ALJ clearly rendered her own medical findings that Plaintiff could perform "simple routine tasks" in the RFC. However, it is well-settled law that an ALJ may not render her own medical opinion and is not empowered to independently assess clinical findings. *See, e.g., Tackett v. Apfel*, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (holding an ALJ erred in rejecting physicians' opinions and rendering his own medical opinion); *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D.

Cal. 2006) ("An ALJ cannot arbitrarily substitute his own judgment for competent medical opinion, and he must not succumb to the temptation to play doctor and make his own independent medical findings"); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms").

Without medical opinions to support the conclusion that Plaintiff had the mental ability to perform simple, routine tasks— and that his memory deficits and impaired concentration would not preclude him from such work for an eight-hour day—the ALJ's mental RFC lacks the support of substantial evidence. *See Perez v. Sec'y of Health & Human Servs.*, 958 F.2d 445, 446 (1st Cir. 1991) ("where an ALJ reaches conclusions about claimant's … capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence"). Accordingly, the ALJ erred in evaluating Plaintiff's mental RFC.

**C.     Remand is Appropriate**

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v*, 80 F.3d at 1292. In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

Here, the mental RFC articulated by the ALJ lacks the support of substantial evidence in the record, and the matter should be remanded for further consideration. *See Tackett*, 180 F.3d at 1102-03 (remanding the matter to the Social Security Administration for reconsideration after finding the ALJ erred by offering his own medical conclusion, which was not supported by any medical evidence);

13

Perez, 958 F.2d at 446 (finding that where the ALJ offered any opinion "without any assessment of residual functional capacity by a physician, …it is necessary to remand for the taking of further functional evidence"). In addition, the ALJ erred in her evaluation of the lay witness testimony by failing to identify germane reasons for rejecting the testimony of Ms. Suluki, and it is appropriate to remand the matter for the ALJ to re-evaluate the lay witness testimony. *See Dodrill*, 12 F.2d at 919 (remanding the matter for an ALJ to "articulate specific findings" concerning the testimony of a lay witness).

## **CONCLUSION AND ORDER**

For the reasons set forth above, the Court finds the ALJ erred in her evaluation of Plaintiff's mental RFC and failed to apply the correct legal standards. Consequently, the ALJ's decision cannot be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Clifford Goolby and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 21, 2017**             /s/ Jennifer L. Thurston
                                  UNITED STATES MAGISTRATE JUDGE